FILED

2021 Sep-15  PM 04:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

United States District Court
Northern District of Alabama
Northeastern Division

USA v. Christopher Arivett
5:21-cr-181-LCB-HNJ

Exhibit 1

# IN THE DISTRICT COURT OF THE UNITED STATES

# FOR THE NORTHERN DISTRICT OF ALABAMA

# NORTHEASTERN DIVISION

IN THE MATTER OF THE SEARCH OF )

██████████████████████ )

MADISON, ALABAMA  35756 )

) Mag. No.: _____

---

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Donald Letterle, being duly sworn, depose and state as follows, to wit:

### PRELIMINARY BACKGROUND INFORMATION

1. I am a Special Agent with Homeland Security Investigations (HSI), and have been so employed since July 2007. I am currently assigned to the Resident Agent in Charge at the Huntsville, Alabama office (HSI Huntsville). I attended and graduated from the Immigration and Customs Enforcement (ICE) Special Agent Training Program, which was conducted at the Federal Law Enforcement Training Center in Glynco, Georgia. At this institution, I received specialized training in narcotics investigations, immigration investigations, fraud investigations, cyber investigations, import/export investigations, child pornography investigations, firearms, defensive

1

tactics, surveillance, and undercover operations, as well as other topics. As a Special Agent with ICE-HSI, I am responsible for investigating and enforcing violations of Federal law to include the enforcement of Federal narcotics laws, Immigration laws, the Money Laundering Control Act, Child Pornography, and various Customs Violations. I have assisted in the investigation of crimes where computers and the internet are used in the sexual exploitation of children, including, but not limited to, violations of 18 U.S.C. Sections 2252 and 2252A, which prohibit a person from producing, knowingly transporting, receiving, distributing, possessing or accessing with intent to view, in interstate or foreign commerce, or by using any facility or means of interstate or foreign commerce, child pornography, as defined in 18 U.S.C. Section 2256(8).

2.     As a federal agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

3.     I am submitting this Affidavit under Rule 41 of the Federal Rules of Criminal Procedure in support of an Application for a Search Warrant authorizing a search of the residential property, vehicles, and outbuildings at ███████████████, Madison, Alabama 35756, as more particularly described in Attachment A.

4.     The purpose of this application is to seize evidence, more particularly described in Attachment B, of violations of 18 U.S.C. Sections 2252(a)(1) and 2252A(a)(1), which make it a crime to transport or ship child pornography in, or using a facility of, interstate or foreign commerce; 18 U.S.C. Sections 2252(a)(4)(B) and 2252A(a)(5)(B), which make

2

it a crime to possess or knowingly access with intent to view, child pornography; and violations of 18 U.S.C. Sections 2252(a)(2) and 2252A(a)(2), which make it a crime to receive and distribute child pornography in, or using a facility of, interstate or foreign commerce.

5.     The facts of this case, as more fully identified herein, are that a subject using the Internet Protocol (IP) address 104.8.205.18 distributed eleven (11) videos depicting child pornography on or about July 08, 2018.  Internet Service Provider (ISP) records show the service address for this IP address to be the physical residential address 13295 Hidden Valley Drive, Madison, Alabama 35756 (hereinafter "SUBJECT PREMISES") and as further described in Attachment A and incorporated herein, and identified the subscriber as William EWING.  I am requesting that the court issue a search warrant directed to search the SUBJECT PREMISES to locate child pornography and conclusively identify the computer user(s) possessing and distributing child pornography.

6.     Because this Affidavit is submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth only those facts that I believe are necessary to establish probable cause to believe that evidence of violations of 18 U.S.C. Sections 2252 and 2252A are located at the SUBJECT PREMISES.

## PERTINENT FEDERAL CRIMINAL STATUTES

7.      This investigation concerns alleged violations of 18 U.S.C. Sections 2252 and 2252A, relating to material involving the sexual exploitation of minors.

8.      Title 18 U.S.C. Sections 2252 and 2252A prohibit a person from knowingly transporting, receiving, distributing, possessing or accessing with intent to view, in interstate or foreign commerce, or by using any facility or means of interstate or foreign commerce, any visual depiction of minors engaging in sexually explicit conduct (child pornography) as defined in Title 18 U.S.C. Section 2256(8).

## DEFINITIONS

9.      The following non-exhaustive list of definitions applies to this Affidavit and Attachments A and B:

      a.      Child Pornography is any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct. *See* 18 U.S.C. Section 2256(8).

4

b.     Child Erotica means materials or items that are sexually arousing to persons having a sexual interest in minors, but that are not, in and of themselves, obscene or illegal. In contrast to "child pornography," this material does not necessarily depict minors in sexually explicit poses or positions. Some of the more common types of child erotica include photographs that are not sexually explicit, drawings, sketches, fantasy writing, and diaries. *See Kenneth V. Lanning, Child Molesters: A Behavioral Analysis* (2001). Federal courts have recognized the evidentiary value of child erotica and its admissibility in child pornography cases. *See United States v. Cross*, 928 F.2d 1030 (11th Cir. 1991) (testimony about persons deriving sexual satisfaction from and collecting non-sexual photographs of children admissible to show intent and explain actions of defendant); *United States v. Caldwell*, No. 97-5618, 1999 WL 238655 (E.D. Ky. Apr. 13, 1999) (child erotica is admissible under Federal Rule of Evidence 404(b) to show knowledge or intent).

c.     Visual depictions include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image. *See* 18 U.S.C. Section 2256(5).

d.     Minor means any person under the age of eighteen years. *See* 18 U.S.C. Section 2256(1).

e.     Sexually explicit conduct means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same

or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any persons. *See* 18 U.S.C. Section 2256(2).

f.      Computer means an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. Section 1030(e)(1).

g.      Computer hardware consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices), peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

h.      Computer software is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer

6

software is stored in electronic, magnetic or other digital form. It commonly includes computer operating systems, applications, and utilities.

i.     Computer-related documentation consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, computer software, or other related items.

j.     Computer passwords and data security devices consist of information or items designed to restrict access to or hide computer software, documentation or data. Data security devices may consist of hardware, software or other programming code. A password (a string of alpha-numeric characters) usually operates a sort of digital key to unlock particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates test keys or hot keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or booby-trap protected data to make it inaccessible or unusable as well as reverse the progress to restore it.

k.     Internet Service Providers or ISPs are commercial organizations, which provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage and co-location of computers and other communications equipment. ISPs can offer various means by which to access the Internet including telephone based

7

dial-up, broadband based access via a digital subscriber line (DSL), coaxial cable data transmission, dedicated circuits, or satellite based subscription. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name such as a user name or screen name, an e-mail address/ mailbox, and the subscriber typically creates a password for the account. By using a computer equipped with a telephone or cable modem, the subscriber can establish communication with an ISP over a telephone line or through a coaxial cable system and can access the Internet by using his or her account name and password.

l.      ISP Records are records maintained by ISPs pertaining to their subscribers (regardless of whether those subscribers are individuals or entities). These records may include account application information, subscriber and billing information, account access information (often times in the form of log files), e-mail communications, information concerning content uploaded and/or stored on or via the ISP's servers, and other information which may be stored both in computer data format and in written or printed record format. ISPs reserve and/or maintain computer disk storage space on their computer system for their subscribers use. This service by ISPs allows for both temporary and long-term storage of electronic communications and many other types of electronic data and files.

8

m.    Internet Protocol address or IP address refers to a unique number used by a computer to access the Internet.  IP addresses can be dynamic, meaning that the Internet Service Provider (ISP) assigns a different unique number to a subscriber's computer at varying intervals at the discretion of the ISP.  IP addresses might also be static meaning an ISP assigns a user's computer a specific IP address which is used each time the computer accesses the Internet.

n.    Records, documents and materials include all information recorded in any form, visual or aural, and by any means, whether in hand-made form (including, but not limited to, writings, drawings, paintings), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, printing and/or typing), or electrical, electronic, or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic, or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical, or electronic storage device).

o.    Digital device includes any electronic system or device capable of storing, processing, interpreting, or rendering data in digital form including computer systems

9

of various form factors (computer desktop systems, towers, servers, laptops, notebooks, and netbooks), personal digital assistants, cellular telephones and smart phones, peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors and drives intended for removable media; related communication devices such as wired and wireless home routers and modems; storage media such as electro-mechanical hard disks, solid state hard disks, hybrid hard disks, floppy disks, optical disks such as compact disks and digital video disks, magnetic tapes, and volatile and non-volatile solid state flash memory chips; and security devices including dongles and flash chips.

p.    Image or copy refers to an accurate reproduction of information contained on an original physical item independent of the electronic storage device. Imaging or copying maintains contents, but attributes may change during the reproduction.

q.    Hash value refers to a value generated after data has been subjected to a cryptographic mathematical algorithm. A hash value is akin to a digital fingerprint in that dissimilar data will not produce the same hash value after being subjected to the same hash algorithm. Therefore, a hash value is particular to the data from which the hash value was generated. Known hash values can be used to search for identical data stored on various digital devices and/or media as identical data will have the same hash value.

10

r.     Compressed file refers to a file that has been reduced in size through a compression algorithm to save disk space. The act of compressing a file will make it unreadable to most programs until the file is uncompressed.

s.     Info Hash ID an identifier used to uniquely identify a particular transaction. This ID is used on chain transactions (the transactions from or to external addresses) and have a unique hash ID that can be seen in transaction details. A transaction hash usually looks like a random set of letters and numbers.

## DETAILS OF THE INVESTIGATION

10.     On July 8, 2018, Northport Police Department Investigator Michael Gilliam of the University of Alabama, Joint Electronic Crimes Task Force was conducting an online investigation on the BitTorrent network for offenders sharing child pornography. An investigation was initiated for a device at IP address: 104.8.205.18 for its association with an infohash ID identified as a file of investigative interest to child pornography investigations.

11.     Using a computer running investigative BitTorrent software, Investigator Gilliam directly connected to the device at IP address 104.8.205.18, (hereinafter "Subject IP Address"). The device at IP address 104.8.205.18 reported it was using BitTorrent client software called -TR2820-Transmission 2.82.

12.    On July 8, 2018, Investigator Gilliam successfully downloaded eleven (11) files from the Subject IP Address. Each of these files contained child pornography. The files are described below.

a.    (Pthc) Open f49-I (9 Yo Girl Fucked with 11 Yo Boy)

This video depicts a prepubescent nine (9) year old girl and a prepubescent eleven (11) year old boy engaging in sexual activity which includes mutual masturbation, sexual intercourse and anal sex. This video lasts 13 minutes and twenty five seconds.

b.    Hc Vim04 – Babysitter And Girl 8Yo – 10Yo Having Sex With Older Sister (Anal Toys!!) Incest -Ped.mpg

This video depicts an adult female molesting and inserting a dildo into the vagina and anus of a prepubescent female between the ages of eight (8) and ten (10) years of age. The video then depicts two prepubescent females between the ages of eight (8) and ten (10) years of age engaging in sex acts. This video lasts 20 minutes and 15 seconds

c.    (Pthc)!!!New 070.mpg

This video depicts two (2) prepubescent females engaging in sex acts with an adult male. This video lasts 11 minutes and 25 seconds.

12

d.    Laura 10Yo (Anal Frontview Upclose, Pthc New 2007).mpg

This video depicts an adult male inserting his penis into the anus of a ten (10) year old pre-pubescent female. This video lasts 3 minutes and 59 seconds.

e.    PTHC Kids Box – 12yo Sawadie Mg12bj pn +++.mpg

This video depicts a prepubescent female approximately 12 years old having sexual intercourse with an unknown adult male. This video lasts approximately 9 minutes and 27 seconds.

f.    (Pthc)!!!New0604Luvnlilly 3Yo(1).avi

This video depicts an adult male inserting his penis into the vagina of a three (3) year old child.

g.    Karina World-Former Ls Magazine Models-Karinaworld 06- 3 young teens (13yo) teasing.avi

This video depicts three females between the ages of thirteen (13) and sixteen (16) years of age removing their clothes and dancing. This video is approximately 6 minutes and 46 seconds.

h.    Pthc – Vera – Piss & Anal Fuck – Full Video !!! – Rape- (pedofilia Pedo Lolitas Children Kids Kidz Kiddy Pretee.avi

13

This video depicts a prepubescent female between the ages of three (3) and eight (8) years old exposing her genitals to a camera, masturbating the penis of an adult male, placing the penis of an adult male in her mouth, having an adult male insert his penis into her anus and the adult male rubbing his penis on the child victims vagina. This video lasts 23 minutes and 18 seconds.

i. 8 and 10 year old brother and sister have pthc sex Lolita ptch R@ygold hussyfan underage preteen.mpg

This video depicts a prepubescent eight (8) year old boy and ten (10) year old girl having sexual intercourse. This video lasts 3 minutes and 9 seconds.

j. !!!NEW Pthc-0607!!!kelly – 7yo backyard fuck & pedo kittycum.mpg

This video depicts a seven (7) year old pre-pubescent female being sexually molested by an adult male. The video shows the adult male rubbing his penis on the vagina and anus of the child victim and ejaculating on her numerous times. This video is approximately 3 minutes and 51 second)

k. Lolita – Brasil Pedofilia 12Y- Flagras Big Brother – Bbb- Sexo Hacker Putaria Kids Pedofilia In.mpg

This video depicts a twelve (12) year old female having her breasts fondled by an unknown male. This video lasts approximately 11 seconds.

13.    On October 9, 2018, the Joint Electronic Crimes Task Force conducted a query of the Subject IP Address through the American Registry for Internet Numbers (ARIN). ARIN reported that the Subject IP Address was registered to AT&T Corp.

14.    On November 7, 2018, Investigator Cathy Davis of the Madison County Sheriff's Office served a Grand Jury subpoena issued from the Twenty-Third Judicial Circuit for the State of Alabama on AT&T requesting that they provide all records regarding the identification of the subscriber of the Subject IP Address. On November 16, 2018, AT&T provided the requested information. According to the records provided by AT&T, the subscriber of the Subject IP Address is listed as William EWING, ███████████████ Madison, Alabama 35756.

15.    On December 7, 2018, HSI Huntsville conducted a query of the State of Alabama Driver License records. According to records provided by the State of Alabama, the address of record for William Alexander EWING is ███████████ ████████ Madison, Alabama. EWING'S driver's license was issued on August 24, 2018 and expires on August 24, 2022. Additionally, on December 18, 2018, HSI Huntsville conducted a driver's license query for the State of Alabama and learned that Christopher Wayne ARIVETT also lists ████████████████ Madison, Alabama as his primary address. According to State of Alabama Driver's License

15

records, the driver's license listing ARIVETT's address as the SUBJECT PREMISE was issued on April 25, 2018 and expires on January 28, 2020.

16. On January 15, 2019, HSI Huntsville conducted a utility check on the address of ███████████████ Madison, Alabama and learned that the registered customer is listed as William Alexander EWING.

## BACKGROUND ON COMPUTERS AND CHILD PORNOGRAPHY AND ONLINE CHILD EXPLOITATION

17. I have been formally trained in the investigation of crimes involving the sexual exploitation of children. I also own my own computer, have personal knowledge of the operation of a computer, and have accessed the Internet since approximately 1999. Based on this training and knowledge, and the experience of other law enforcement personnel involved in this investigation, I know the following:

18. The Internet is a worldwide computer network that connects computers and allows communications and the transfer of data and information across state and national boundaries. Computer technology and the Internet revolutionized the way in which child pornography is produced, distributed, stored, and communicated as a commodity and a further tool of child exploitation. For instance:

16

a.     Individuals can transfer photographs from a camera onto a computer-readable format with a variety of devices, including scanners, memory card readers, or directly from digital cameras, including those on most cellphones.

b.     Modems allow computers to connect to another computer through the use of telephone, cable, or wireless connection.  Electronic contact can be made to literally millions of computers around the world.

c.     The capability of a computer to store images in digital form makes the computer itself an ideal repository for child pornography.  As explained further below, the storage capacity of electronic media used in home computers has increased tremendously within the last several years.  These drives can store an extreme amount of visual images at very high resolution.

d.     The Internet, the World Wide Web and other Internet components afford individuals many different and relatively secure and anonymous venues for obtaining, viewing and trading child pornography, for communicating with others to do so, and to entice children.

e.     Individuals can use online resources to retrieve, store, and share child pornography, including services offered by Internet Portals such as Google, America Online (AOL), Yahoo! and Hotmail, among others.  Online services allow a user to set up an account providing e-mail and instant messaging services, as well as electronic

17

storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. Evidence of such online storage of child pornography is often found on the user's computer. Even in cases where online storage is used, evidence of child pornography can be found on the user's computer in most cases.

f.      As is the case with most digital technology, computer communications can be saved or stored on hardware and computer storage media used for these purposes. Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite web sites in bookmarked files. However, digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places ( such as temporary files or ISP client software -). In addition to electronic communications, a computer user's Internet activities generally leave traces or footprints in the web cache and history files of the browser used. Such information is often maintained for very long periods of time until overwritten by other data.

g.      The interaction between software applications and the computer operating systems often results in material obtained from the Internet being stored multiple times in different locations on a computer hard drive without the user's knowledge. Even if the computer user is sophisticated and understands this automatic storage of information on his computer's hard drive, attempts at deleting the material

often fail because the material may be automatically stored multiple times and in multiple locations within the computer media. As a result, digital data that may have evidentiary value to this investigation could exist in the user's computer media despite, and long after, attempts at deleting it. A thorough search of this media could uncover evidence of receipt, distribution, and possession of child pornography.

h.      Data that exists on a computer is somewhat resilient to deletion. Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little to no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensic tools. When a person deletes a file on a home computer, the data contained in the file does not actually disappear, rather, the data remains on the hard drive until it is overwritten by new data. Therefore, deleted files or remnants of deleted files, may reside in free space or slack space, which is in space on the hard drive that is not allocated to an active file and is left unused and free to store new data. Such residual data may remain in free space for long periods of time before it is overwritten by new data. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to

19

these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

## BACKGROUND ON PEER TO PEER FILE SHARING

19. A common use of the Internet is peer to peer file sharing (hereinafter "P2P"). P2P file sharing is a method of communication available to Internet users through the use of special software. Computers linked together through the Internet using such software form a network that allows for the sharing of digital files between users on the network. A user first obtains the P2P software, which can be downloaded from the Internet. In general, P2P software allows the user to designate file(s) on a computer to be shared with others worldwide running compatible P2P software. A user looking to download files simply conducts a keyword search. The results of the keyword search are displayed and the user then selects the file(s) which he/she wants to download. The download of a file is achieved through a direct connection between the computer requesting the file and the computer(s) hosting the file. Once a file has been downloaded, it is stored in the area previously designated by the user and will remain there until moved or deleted.

20. Even though the P2P network links together computers all over the world and users can download files, it is not possible for one user to send or upload a file to

20

another user of the P2P network. The software is designed only to allow files that have been selected to be downloaded. A user does not have the ability to send files from his/her computer to another user's computer without that user's permission or knowledge. Therefore, it is not possible for a user to obtain child pornography files from another user's computer without actively participating in the process by choosing the file(s) to download and then commanding his/her computer to obtain the file(s).

21. A P2P file transfer is accomplished by reference to an Internet Protocol (IP) address. This address, expressed as four groups of numbers separated by decimal points, is unique to a particular computer during an online session. The IP address provides a unique location making it possible for data to be transferred between computers. Software is available to identify the IP address of the P2P computer sending the file and to identify if parts of the file came from one or more IP addresses. Such software monitors and logs Internet and local network traffic. In addition, most of the P2P software applications keep logs of each download event.

22. The computers that are linked together to form a P2P network are located throughout the world; therefore, the P2P network operates in interstate and foreign commerce. A person that includes child pornography files in his/her "shared" folder is hosting child pornography and is thereby promoting, presenting, and potentially distributing child pornography. A person that knowingly hosts child pornography in this fashion is in violation of Title 18 U.S.C. 2252A (a)(3)(B) in that he/she is promoting

21

and presenting child pornography in interstate and foreign commerce by means of a computer.

## LAW ENFORCEMENT INVESTIGATIONS CONCERNING P2P NETWORKS

23.    In an effort to identify individuals who are in possession of and distributing child pornography via P2P networks, software has been developed for law enforcement use that assists in these types of investigations. This software compares hash values of files made available for download by other P2P users with hash values of known child pornography identified by other law enforcement officers who have encountered those particular files in other investigations. If a hash value match indicating child pornography is determined, the program will note the IP address of the computer making the files available for download. Investigators then may attempt to download the files directly from the suspect IP address. If the investigators are unable to download the child pornography from the suspect IP address, they are still able to compare the hash values of the files being shared against the hash values of known child pornography to determine what exactly is being shared. Therefore, even though the investigator may be unable to download files from the suspect IP address, the investigator can view the hash values of files that were possessed and/or made available for download and determine via hash value comparison if the hash value of available files corresponds to previously identified child pornography. A hash value refers to a

22

value generated after data has been subjected to a cryptographic mathematical algorithm. A hash value is akin to a digital fingerprint in that dissimilar data will not produce the same hash value after being subjected to the same hash algorithm. Therefore, a hash value is particular to the data from which the hash value was generated. As hash values are more reliable than DNA evidence, it can be concluded that a file made available for download on a P2P network with a hash value matching previously identified child pornography, is in fact, child pornography.

24.    It should be noted that the P2P software utilized is not capable of identifying all child pornography files a person possesses, because it is limited to its database of files previously identified as child pornography. The software cannot identify new, homemade, modified, or other as yet unidentified child pornography files. In addition, the software is only able to access files on the host computer which are located in the host computer's P2P shared folders, and thus cannot attempt to identify child pornography contained outside of said folders. Based on my experience and training, the number of known child pornography files identified by the software is likely to be an under-representation of the total number of files possessed by the user.

## BACKGROUND ON THE BITTORRENT NETWORK

25.    BitTorrent is one type of P2P file sharing software. Users of the BitTorrent network wishing to share new content will use a BitTorrent program to create a "torrent" file for the file or group of files they wish to share. A torrent file is a small

23

file that contains information about the file(s) and provides a method for a user to download the file(s) referenced in the torrent from other BitTorrent users. Torrent files are typically found as the result of keyword searches on Internet sites that host or link to them. Torrent files may be referenced by their "infohash", which uniquely identifies the torrent based on the file(s) associated with the torrent file. To download file(s) from other users on the BitTorrent network, a user typically obtains a torrent file. The BitTorrent software processes the information in the torrent file and locates devices on the BitTorrent network sharing all or parts or the actual file(s) being sought. The download of the content referenced in the torrent is achieved after the requesting computer and the sharing computer(s) directly connect to each other through the Internet using the BitTorrent software.

26. One of the advantages of P2P file sharing is that multiple files may be downloaded at the same time. In addition, a user may download parts of one file from more than one source computer at a time. For example, a BitTorrent user downloading a movie file may actually receive parts of the movie from multiple computers. The advantage of this is that it speeds up the time it takes to download the file. It is possible to also download the file or files from only one computer

27. The BitTorrent Network bases all of its file shares on the Secure Hash Algorithm (SHA1). This mathematical algorithm allows for the digital fingerprinting of data. Once

24

you check a file or files with a SHA1 hashing utility capable of generating this SHA1 value (the fingerprint), that will be a fixed-length unique identifier for that file.

28.    A P2P file transfer is assisted by reference to an Internet Protocol (IP) address. This address is unique to a particular computer during an online session. The IP address provides a unique location making it possible for data to be transferred between computers.

## BACKGROUND ON COMPUTERS AND EVIDENCE ASSESSMENT PROCESS IN CHILD PORNOGRAPHY AND CHILD EXPLOITATION INVESTIGATION

29.    This warrant seeks permission to locate not only computer files that might serve as direct evidence of the crimes described in the warrant but also for evidence that establishes how computers were used, the purpose of their use, and who used them.

30.    As described above and in Attachment B, this application seeks permission to search and seize certain devices that might be found in the SUBJECT PREMISES, in whatever form they are found. One form in which the records might be found is stored on a computer's hard drive, or other electronic devices. Some of these electronic records might take the form of files, documents, and other data that is user-generated. Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis. In addition to user-generated documents (such

25

as word processor, picture, and movie files), computer hard drives can contain other forms of electronic evidence that are not user-generated. In particular, a computer hard drive may contain records of how a computer has been used, the purposes for which it was used, and who has used these records, as described further in the attachments.

31.    Based upon my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that segregating information before commencement of the review of digital evidence by the examining agent is inconsistent with the evidence assessment process in child pornography and online child exploitation investigations. This is true in part because the items to be searched will not only contain child pornography, but also will contain the identity of the user/possessor of the child pornography.. The items may also contain evidence about the programs and software used to obtain the child pornography, which may be located throughout the areas to be searched. It is not possible to know in advance which computer(s) and storage media will contain evidence of the specified crimes, and often, such evidence is contained on more than one computer or digital storage device. Further:

    a.    Searching digital devices can be a highly technical process that requires specific expertise, specialized equipment and knowledge of how electronic and digital devices are often used in child pornography and online child exploitation matters. There are so many types of digital devices and software in use today that it is impossible

26

to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.

b.      Because of the numerous types of digital devices and software that may contain evidence in child pornography and online child exploitation cases, it may also be necessary to consult with specially trained personnel who have specific expertise in the type of digital device, software application, or operating system that is being searched in an off-site and controlled laboratory environment.

c.      Because digital data is particularly vulnerable to inadvertent or intentional modification or destruction, searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted or password-protected data. Data hiding analysis can be useful in detecting and recovering such data and may indicate knowledge, ownership, or intent. The recovery of "hidden" data is highly specialized and time-intensive. For this reason, on-site key word searches are not sufficient to recover inadvertently or intentionally modified or destroyed data. Similarly, running hash values on-site to find files that contain child pornography is not an adequate on-site review and seizure procedure, because, while hash values locate previously identified files of child pornography, they do not capture files that are the result of new production, images imbedded in an alternative file format, or images altered, for instance, by a single pixel. As a result, a controlled environment, such as a law

27

enforcement laboratory, is essential to conducting a complete and accurate analysis of data stored on digital devices.

d.      The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 gigabytes (GB) of data are now commonplace in desktop computers. Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 240 million pages of data. Further, a 500 GB drive could contain as many as approximately 450 full -run movies or 450,000 songs. Depending on the volume of the data stored, examining this quantity of data can take weeks or months, and it would be impractical to attempt this kind of data search on-site.

e.      Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Similarly, files that have

28

been viewed via the Internet are automatically downloaded into a temporary Internet directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment.

f.      Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users may also attempt to conceal data by using encryption, which means that a password or physical device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is

29

necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

g.    Further, in finding evidence of how a computer has been used, the purposes for which it was used, and who has used it, sometimes it is necessary to establish that a particular thing is not present on a hard drive or that a particular person (in the case of a multi-user computer) was not a user of the computer during the time(s) of the criminal activity. For instance, based upon my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that when a computer has more than one user, files can contain information indicating the dates and times that files were created as well as the sequence in which they were created, so that evidence of whether a user accessed other information close in time to the file creation dates, times and sequences can help establish user identity and exclude other users from computer usage during relevant times.

h.    Because the absence of particular data on a digital device may provide evidence of how a digital device has been used, what it has been used for, and who has used it, analysis of the digital device as a whole may be required to demonstrate the absence of particular data. Such evidence of the absence of particular data on a digital device is not segregable from the digital device.

30

i.      The types of evidence described above may be direct evidence of a crime, indirect evidence of a crime indicating the location of evidence or a space where evidence was once located, contextual evidence identifying a computer user, and contextual evidence excluding a computer user. All of these types of evidence may indicate ownership, knowledge, and intent. This type of evidence is not "data" that can be segregated, that is, this type of data cannot be abstractly reviewed and filtered by a seizing or imaging agent and then transmitted to investigators. Rather, evidence of this type is a conclusion, based on a review of all available facts, the application of knowledge about how a computer behaves, and how computers are used. Therefore, contextual information necessary to understand the evidence described in Attachment B also falls within the scope of the warrant.

j.      As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. A forensic examiner often can recover evidence suggesting whether a computer contains peer-to-peer software, when the computer was sharing files, and some of the files which were uploaded or downloaded. Such information is often maintained indefinitely until overwritten by other data.

31

k.    Based upon my knowledge, training and experience, as well as information relayed to me by agents and others involved in the forensic examination of digital devices, I know that it is typically necessary to seize all types of electronic devices capable of storing digital evidence as described in the Affidavit and Attachment B for off-site review because computer searches involve highly technical, complex, time-consuming and dynamic processes.

## CHARACTERISTICS OF INDIVIDUALS INVOLVED IN CHILD PORNOGRAPHY OFFENSES

32.    Based upon my knowledge, experience, and training in child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I have learned that there are certain characteristics common to many individuals involved in the possession and distribution of child pornography.  Those who possess and distribute child pornography often:

a.    Receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media; or from literature describing such activity.

b.    May collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or

drawings or other visual media.  Such individuals oftentimes use these materials for their own sexual arousal and gratification.  Further, they may use these materials to lower the inhibitions of children who they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c.      May possess and maintain hard copies of child pornographic material, such as pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location.  Some of these individuals retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

d.      Often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area. These collections are often maintained for several years and are kept close by, usually at the individual's residence, to enable the collector to view the collection which is valued highly.

e.      Often possess multiple digital devices, such as desktop and laptop computers, smart phones, tablet computers, etc. and multiple storage devices, such as flash drives and memory, external hard drives, CDs, etc. which are used to access, distribute, and store child pornography.  Many of these items are small. Some flash memory devices are smaller than a postage stamp and easily concealed.

33

f.    Tend to keep their older devices even after upgrading to newer technology.  The older devices, along with the items stored on them, are often still accessible.

g.    May utilize online/remote storage services to store, access, and distribute child pornography.  The content stored on online storage services may accessible through the subject's computer while it is logged in but may be difficult to obtain once the computer is turned off.

h.    May correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

i.    Prefer not to be without their child pornography for any prolonged time period.  This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

j.    Increasingly, with faster Internet download speed and the growth of file-sharing networks and other platforms through which individuals may trade child pornography, some of these individuals also have been found to download, view, and

34

then delete child pornography on their computers or digital devices on a cyclical and repetitive basis. The individual will replenish their supply via their peer to peer connection when they desire more images to satisfy their sexual interest in children. Evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices through the use of forensic tools. Even in instances in which an individual engages in a cycle of downloading, viewing, and deleting images, a selection of favored images involving a particular child or act are often maintained on the device. Further, a computer user's Internet activities generally leave traces in the web cache and history files of the browser used. A forensic examiner can often recover evidence indicating whether a computer contains peer-to-peer software, when the computer was sharing files, and some of the files which were uploaded or downloaded. Such information is often maintained indefinitely until overwritten by other data.

## CONCLUSION

33.    Based on the foregoing, I believe that there is probable cause that evidence, fruits and instrumentalities of these offenses, more fully described in Attachment B of this Affidavit, are located at the SUBJECT PREMISES, as more fully described in Attachment A.

Respectfully submitted,

Special Agent Donald J. Letterle
Homeland Security Investigations

Subscribed and sworn before me this ___16___ of January 2019.

The Honorable Herman N. Johnson, Jr.
United States Magistrate Judge

36

## ATTACHMENT A

## DESCRIPTION OF THE PROPERTY TO BE SEARCHED

The SUBJECT PREMISES contains a single story home residence located at ████████████████████████ Madison, Alabama 35756. The residence has brick siding with off white trim. The residence is the second home from the intersection of Hidden Valley Drive and Whispering Lane on the Western side of the street. The residence has a red semi-truck and a basketball hoop in the driveway. The request to search includes the residence and any and all outbuildings, storage spaces, and vehicles located on the property.



37

## ATTACHMENT B

## ITEMS TO BE SEARCHED AND SEIZED

The items, information, devices, and data to be seized are fruits, evidence, information relating to, contraband, or instrumentalities of violations of Title 18 U.S.C. Sections 2252 and 2252A including but not limited to:

1.    Images of child pornography and files containing images of child pornography in any form wherever they may be stored or found including:

a.    Any computer, computer system and related peripherals; cellular phones, personal digital assistants, tapes, cassettes, cartridges, streaming tape, commercial  software and hardware, computer disks, disk drives, monitors, computer printers, scanners, modems, tape drives, disk applications programs, data disks, system disk operating systems, magnetic media floppy disks, hardware and software operating manuals, tape systems and hard drive and other computer related operation equipment, firewalls, switches, hubs, wireless access points, gaming consoles, web cameras, uninterrupted  power supplies, hardware device power supplies, tape backup drives, digital video recorders, undeveloped photographic film, slides, and other visual depictions of such graphical formats (including, but not limited to, JPG, GIF, TIP, AVI, and MPEG), and any electronic data storage devices including, hardware, software, diskettes, backup tapes, CD-ROMS, DVD, flash memory devices, and

other storage mediums; the contents of any attached network or remote storage; any input/output peripheral devices, including but not limited to computer passwords and data security devices an computer-related documentation, and any hardware/software manuals related to or used to: visually depict child pornography; contain information pertaining to the interest in child pornography; distribute, receive, or possess child pornography; contain information pertaining to an interest in child pornography; or contain information pertaining to an interest in child pornography;

    b.    Books and magazines containing child pornography;

    c.    Originals, copies, and negatives of visual depictions of child pornography;

    d.    Motion pictures, films, videos, and other recordings of visual depictions of child pornography.

2.    Records, information, correspondence documents or other materials pertaining to the possession, receipt or distribution of child pornography including:

    a.    Envelopes, letters and other correspondence including electronic mail, chat logs, and electronic messages, establishing possession, access to, or transmission through interstate or foreign commerce, including by U.S. mail or by computer, of child pornography; and

b.    Books, ledgers and records bearing on the productions, reproduction, receipt, shipment, orders, requests, trades, purchases or transactions of any kind involving the transmission through interstate or foreign commerce including by U.S. mail or by computer of child pornography;

c.    Any and all records, documents, or materials, including any and all address books, mailing lists, supplier lists, mailing address labels and any and all documents and records pertaining to the preparation, purchase and acquisition of names or lists of names to be used in connections with the purchase, sale, trade or transmission of child pornography, through interstate commerce including by U.S. mail or by computer;

d.    Any and all records, documents or.materials, including any and all address books, names and lists of names and addresses of minors visually depicted in child pornography;

e.    Any and all records of Internet usage including user names and e-mail addresses and identities assumed for the purposes of communication on the Internet to purchase, sell, trade, transmit, or acquire child pornography. These records may include ISP records, i.e., billing and subscriber records, chat room logs, e-mail messages and include electronic files in a computer and on other data storage mediums, including CDs and DVDs.

40

3.      Credit card information which evidence ownership or use of the computer equipment found in the above residence, including payment for Internet access and computers or electronic media or other storage devices, disks, CD-ROMS, or similar containers for electronic evidence.

4.      Records evidencing occupancy or ownership of the premises described above, including utility and telephone bills, mail envelopes or addressed correspondence; and

5.      Records or other items which evidence ownership or use of computer equipment found in the above residence, including sales receipts, bills for Internet access and handwritten notes.

6.      For any digital device (as defined within this affidavit) found to contain information otherwise called for by this warrant:

    a.      Evidence of who used, owned, or controlled the digital device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, saved usernames and passwords, documents, and browsing history;

    b.      Evidence of software that would allow others to control the digital device, such as viruses, Trojan horses, and other forms of malicious software;

    c.      Evidence of the lack of such malicious software;

41

d.      Evidence of the attachment to the digital device of other storage devices, disks, CD-ROMS, or similar containers for electronic evidence;

e.      Evidence of the times the digital device was used;

f.      Passwords, encryption keys, and other access devices that may be necessary to access the digital device.

g.      Documentation and manuals that may be necessary to access or conduct an examination of the digital device.

h.      Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the digital device.

42